**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

JOSEPH Z. WOMBLE,        )
                                  )
             Plaintiff,      )
                                  )
v.                                )     Case No. 6:14-cv-385-JAR
                                  )
JERRY CHRISMAN       )
and TOMMY SHARP,      )
                                  )
           Defendants.    )

## OPINION AND ORDER

This matter comes before the Court on defendants' motion for summary judgment [Doc. 185].[1] Plaintiff Joseph Womble, an inmate in the custody of the Oklahoma Department of Corrections ("ODOC"), is incarcerated at James Crabtree Correctional Center ("JCCC") in Helena, Oklahoma. He asserts two claims under 42 U.S.C. § 1983 seeking relief for alleged constitutional violations during his incarceration at Mack Alford Correctional Center ("MACC") in Stringtown, Oklahoma.[2] Mr. Womble contends this action arose from overcrowding caused by ODOC transferring over 120 inmates to MACC in May 2014, and alleges that Jerry Chrisman and Tommy Sharp ("Defendants") – the former Warden and Deputy Warden at MACC, respectively – violated his Eighth Amendment rights to sanitary

---

[1] By virtue of the express consent of all parties [Doc. 135 at 6], and in accordance with Fed. R. Civ. P 73(a) and 28 U.S.C. § 636(c)(1), the undersigned United States Magistrate Judge exercises complete jurisdiction over this action through and including trial and the entry of a final judgment.

[2] Mr. Womble was released from ODOC custody during pendency of this action after completing the sentence he was serving when the claims at issue arose. He returned to ODOC custody in August 2023 pursuant to new felony convictions.

prison facilities and adequate nutrition. Mr. Womble seeks compensatory and punitive damages against Defendants in their individual capacities.

## I.   BACKGROUND [3]

Before stating the uncontroverted facts of this case, the Court must first address the parties' factual contentions in some depth, for "[t]he first step in assessing the constitutionality of [Defendants'] actions is to determine the relevant facts." Scott v. Harris, 550 U.S. 372, 378 (2007).

### A.   THRESHOLD FACTUAL ARGUMENTS

It is well-settled in the Tenth Circuit that district courts may consider only admissible evidence in ruling on a summary judgment motion. *See* Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998). To defeat summary judgment, the nonmovant need not convince the court that he will prevail at trial but must cite to sufficient evidence admissible at trial to allow a reasonable jury to find in his favor. *See* Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005). The existence or nonexistence of a material disputed fact may be established through:

- citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in the record; or

- demonstration "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. ("FRCP") 56(c)(1)(A)-(B). To oppose summary judgment, Mr. Womble offers the following challenged evidence: (1) an unsworn letter from inmate Michael

---

[3] For clarity and consistency herein, when the Court cites to the record, it uses the pagination and document numbers assigned by CM/ECF.

Yoder; (2) portions of his own declarations and deposition testimony; and (3) an expert report regarding the nutritional quality and quantity of food served to Mr. Womble at MACC. Defendants concede these materials create factual disputes, but argue such disputes are not genuine. *See* [Doc. 193 at 1-2].

### 1.    Unsworn Hearsay Statements of Michael Yoder

To support the allegation that Defendants ordered food to be rationed at MACC from May 2014 to August 2016,[4] Mr. Womble points to a letter written by Michael Yoder. *See* [Doc. 192-1 at 7-12]. Like Mr. Womble, Mr. Yoder was formerly incarcerated at MACC and is currently incarcerated at JCCC. [*Id*. at 2, 10]. Defendants argue the Court should disregard the unsworn statements of Mr. Yoder as inadmissible hearsay. By definition, hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. ("FRE") 801(c). The "matter asserted" in the challenged letter is that – on an unspecified date – MACC Food Service Manager, Donna Vitoski, told Mr. Yoder that Mr. Chrisman directed her to "reduce [food] portions" and "find other cost-cutting measures." [*Id*. at 10]. This is triple hearsay, which carries a hallmark of unreliability and is admissible only "if each part of the combined statement conforms with an exception to the hearsay rule." FRE 805; *see also* United States v. Lozado, 776 F.3d 1119, 1121 (10th

---

[4] It is undisputed that Mr. Chrisman retired as the MACC Warden on June 1, 2015, and that Mr. Sharp retired as MACC's Deputy Warden on February 1, 2015. Therefore, the allegations giving rise to Mr. Womble's remaining claims occurred between May 1, 2014 and June 1, 2015 as against Mr. Chrisman, and between May 1, 2014 and February 1, 2015 as against Mr. Sharp. The Court notes that Mr. Womble, as the party opposing summary judgment, must "designate *specific* facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (*quoting* FRCP 56(e)) (emphasis added). That is, to oppose summary judgment, Mr. Womble must "ensure that the factual dispute is portrayed with *particularly*." Cross v. The Home Depot, 390 F.3d 1283, 1290 (10th Cir. 2004) (quotation marks omitted) (emphasis added).

Cir. 2015) ("Hearsay is generally inadmissible as evidence because it is considered unreliable.").

Mr. Womble identifies three hearsay exceptions that he contends render the challenged letter admissible. First, he argues the letter is admissible under FRE 804(a)(5) because Mr. Yoder is unavailable as a witness in light of his ongoing incarceration and Mr. Womble's inability, by process or other reasonable means, to procure his testimony. [Doc. 192 at 12, n.2]. The contention that he has been unable to procure a sworn statement from Mr. Yoder since initiating this action in September 2014 is unconvincing, particularly in light of the fact that Mr. Womble has relied upon Mr. Yoder's statements to support his allegations of rationing since at least 2019, *see* §I(A)(2) *infra*, and has not sought leave from this Court under FRE 30(a)(2)(b) to compel the testimony of a person, such as Mr. Yoder, who is confined in prison. The requirements of FRE 804(a)(5) have not been satisfied as to Mr. Yoder's portion of the multi-layered hearsay statement, and Mr. Womble makes no attempt to show the remaining parts of the combined statement comport with the same.

Second, Mr. Womble contends the challenged letter is admissible under FRE 804(b)(3) as statements made against Mr. Yoder's proprietary or pecuniary interests because "he only serves to be retaliated against for cooperating in a lawsuit against long-tenured DOC employees." [Doc. 192 at 12, n.2]. Taking this logic to its reasonable conclusion, any unfavorable statement made by third-party inmates against defendant-officials would constitute admissible hearsay under FRE 804(b)(3). This would be true even when, as alleged here, the hearsay statement could hypothetically

4

expose an inmate to unconstitutional retaliation from government officials. This is not the law. Mr. Womble has cited no law to suggest otherwise, nor has he shown that the remaining parts of the combined statement comport with the requirements of FRE 804(b)(3).

Finally, Mr. Womble contends the challenged letter is admissible under the residual hearsay exception, which provides:

> (a) *In General.* Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
> > (1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement; and
> >
> > (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.
>
> (b) *Notice.* The statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement – including its substance to the declarant's name – so that the party has a fair opportunity to meet it. The notice must be provided in writing before the trial or hearing – or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice.

FRE 807(a)-(b). Because the residual hearsay exception is intended for "exceptional circumstances," proponents of such evidence bear a "heavy burden" when presenting the trial court with sufficient indicia of trustworthiness. United States v. Trujillo, 136 F.3d 1388, 1395-96 (10th Cir. 1998). With regard to the notice requirement, Mr. Womble's attorneys assert (and Defendants do not dispute) that they received Mr. Yoder's letter on December 18, 2023 [Doc. 192-1 at 1, ¶4], and disclosed it to counsel for Defendants at some point before discovery closed on December 29, 2023. *See* [Doc. 192 at 12, n.2; Doc. 154 at 1]. The Court nevertheless finds no "equivalent

circumstantial guarantees of trustworthiness" necessary to support admission of Mr. Yoder's multi-layered hearsay statement, despite Mr. Womble's conclusory assertion that this evidence is more probative than any other evidence he can obtain through reasonable efforts. *See* United States v. Harrison, 296 F.3d 994, 1004-07 (10th Cir. 2002) (district courts must balance the need for evidence against its trustworthiness). And Mr. Womble again makes no attempt to show the remaining parts of the combined statement comport with the requirements of FRE 807.

In sum, Mr. Womble has not identified an applicable exception to the hearsay rule that would make Mr. Yoder's description of Mr. Chrisman's alleged statement to Ms. Vitoski admissible at trial. The Court therefore cannot consider Mr. Yoder's letter in making its summary judgment ruling. *See* Adams v. Am. Guarantee & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (*quoting* Wright-Simmons, 155 F.3d at 1268) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'").

## 2.   Plaintiff's Sworn Hearsay Statements

In the same vein, Mr. Womble asserts in his 2019 declaration that both Defendants instructed Ms. Vitoski to reduce portions served at MACC. *See* [Doc. 192-5, ¶32]. When questioned about the source of this allegation during a deposition in 2023, Mr. Womble testified: "I was told by an inmate in the kitchen, Michael Yoder, that there had been a memo to make – reduce the food service portion . . .. That was the basis of that allegation." [Doc. 192-3 at 16 (59:19-60:7)]. Mr. Womble's testimony

regarding Mr. Yoder's alleged description of a "memo" directing portion reduction does not create a genuine dispute of fact because this evidence constitutes quadruple hearsay derived from – yet not fully corroborating – the inadmissible triple hearsay statement of Mr. Yoder. *See* FRCP 56(c)(4) (declarations used in opposition to a motion must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *see also* Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (holding inadmissible hearsay testimony submitted in depositions may not be considered in a summary judgment ruling). Accordingly, the deposition testimony of Mr. Womble and the portions of his declaration that are based upon the inadmissible hearsay statements of Mr. Yoder cannot be considered by the Court on summary judgment.

In addition, Defendants argue the Food Service Report [Doc. 187-19] contradicts Mr. Womble's sworn statements that food rationing occurred from May 2014 to August 2016. *See* Scott, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). While Mr. Womble claims he personally experienced 27 months of consecutive rationing [Doc. 192-5, at 7-10, ¶30], the Food Service Report shows that additional meals were prepared at nearly every service from October to December 2014. *See generally* [Doc. 187-19]. In light of this contradicting evidence, the Court is not convinced a reasonable jury could find

that food was rationed at MACC for a consecutive 27-month period. To the extent Mr. Womble's declaration and deposition testimony allege food rationing occurred from October to December 2014, the Court will not consider such evidence on summary judgment.

### 3.    Export Report of Jane Reagan, MEd, RDN, CEDS

Defendants further argue that the export report [Doc. 192-9] regarding the nutritional quality and quantity of food served to Mr. Womble during his incarceration at MACC is "too attenuated or unreliable to create an issue of fact." [Doc. 193 at 3]. While "a determination of the credibility of the expert's testimony is not appropriate on summary judgment, a trial court may inquire into the reliability and the foundation underlying the expert's opinion, as well as the qualifications of the witness to testify as an expert." Powell v. Fournet, 1992 WL 150085, at *2 (10th Cir. 1992) (internal citations omitted). Accordingly, "the testimony of an expert can be rejected on summary judgment if it is conclusory and thus fails to raise a genuine issue of material fact," Matthiesen v. Banc One Mortg. Corp., 173 F.3d 1242, 1247 (10th Cir. 1999), or if the expert's opinions reach the ultimate issues of law, Cooperman v. David, 23 F.Supp.2d 1315, 1318 (D. Wyo. 1988), aff'd, 214 F.3d 1162 (10th Cir. 2000).

Defendants specifically challenge the reliability of the expert's calculations regarding Mr. Womble's daily caloric intake. The expert report determined Mr. Womble "was consistently being served 1,587 calories less than he needed each day" based on the following example of a single day of food service:

> Breakfast: 8 oz of gravy, 2 – 1 oz biscuits, 4 oz of oatmeal
> Lunch: 1 – 2 oz roll, 1 thin slice of bologna
> Dinner: 4 oz chicken patty, 1 – 2 oz roll

[Doc. 192-9 at 4 (*citing* Doc. 192-5, ¶¶33-35)]. These portion sizes were provided by Mr. Womble based on his "personal observation" of the volume of food served within the slots of MACC food trays. *See* [Doc. 193-5 at 5-7 (66:10-68:12), 24 (162:6-15)]. The expert report did not provide an independent review of the "master menu," which documented portion sizes of rotating daily meals served to inmates by volume, weight, and/or item.

| | Regular | 3 oz | lunch meat (E) | 4 oz | beef patty (E) |
|---|---|---|---|---|---|
| 1/2 c | fortified fruit drink | 2 sl | bread or 1 roll | 1/4 c | gravy |
| 1 c | hot or cold cereal | 1 c | lettuce, onions, pickles | 1 c | potatoes or 2/3 c rice |
| 2 ea | pancakes | 2 Tbs | mustard or salad dressing | 1 c | greens, broccoli, or carrots |
| 2 oz | turkey ham (E) | 1 c | mixed vegetables | 2 sl | bread or 1 roll |
| 2 oz | syrup | | | 1 ea | fruit |
| 2 c | milk | 2 ea | cookies | 1 c | tea or fruit drink |
| 1 c | coffee | 1 c | tea or fruit drink | | |
| # 10 sc | peanut butter (AEV & AENP) | 1 c | black-eyed peas (AEV) | 1 c | navy beans (AEV) |

[Doc. 187-21 at 3 (*i.e.*, master menu portion sizes for single day of "Regular" meals)].

| | Diet for Health | 3 oz | LF/LS chicken salad (E) | 4 oz | LF/LS beef patty (E) |
|---|---|---|---|---|---|
| 1/2 c | fortified fruit drink | 2 sl | WW bread or 1 WW roll | | |
| 1 sl | WW toast | 1 c | lettuce, onions | 1 c | potatoes or 2/3 c rice |
| 1/2 c | oatmeal or 3/4 c cheerios | 2 Tbs | mustard or salad dressing | 1 c | greens, broccoli, or carrots |
| 1 oz | turkey ham (E) | 1 c | LF/LS mixed vegetables | 2 sl | WW bread or 1 WW roll |
| 2 Tbs | jelly | | | 1 ea | fruit |
| 2c | milk | 2 ea | cookies | 1 c | tea or fruit drink |
| 1 c | coffee | 1 c | tea or fruit drink | | |

[*Id.* (*i.e.*, master menu portion sizes for single day of "Diet for Health" meals)].

Pursuant to FRE 702, expert testimony must be "based upon sufficient facts or data" as well as "the product of reliable principles and methods" and the expert must have "applied the principles and methods reliably to the facts of the case." Defendants correctly contend that without evidence demonstrating the "example" provided by Mr. Womble was served with any specific regularity, his expert's report lacks a proper

foundation. *See* [Doc. 193 at 4]. The Court concludes that the challenged expert report was not based on sufficient facts or data; therefore, the Court cannot consider Mr. Womble's expert report on summary judgment.

## B. UNDISPUTED MATERIAL FACTS

The following facts are supported by evidence in the record and are taken as true with all reasonable inferences therefrom drawn in favor of the non-moving party, Mr. Womble, who was incarcerated at MACC from January 26, 2012 through August 8, 2018. [Doc. 185 at 8, ¶1; Doc. 192 at 15, ¶1-4].

### 1. MACC Facilities

MACC consists of three housing units: A, B, and C. The A and B units each contain two pods: A-North, A-South (or "A-S"), B-North, and B-South. The A-South unit contains several common areas – including a day room, television room, and library – as well as 50 cells divided evenly into two tiers. [Doc. 187-23]. The designed capacity of A-South is 100 inmates, as each cell holds two inmates and contains two bunks, a toilet, and a sink. [*Id*.]. In addition, both tiers of the A-South unit contain seven showers, for a total of 14 showers to be shared amongst all A-S inmates. [*Id*.].

On April 17, 2014, the capacity of A-South was increased by the fire marshal from 100 to 132 inmates. [*Id*.]. On May 1, 2014, ODOC transferred 128 inmates to MACC from various county jails in Oklahoma and the population of A-South consequently increased from 100 to either 126 or 132 inmates.[5] To accommodate these

---

[5] The number of inmates housed in A-South following the May 2014 influx is disputed. While Defendants assert the unit population increased from 100 to 126 inmates [Doc. 187-23], Mr. Womble contends the unit population increased from 100 to 132 inmates [Doc. 192 at 9, ¶13].

new inmates, temporary bunks were constructed in the common areas of A-South and two cells – later, three cells – were left vacant to make two to three additional toilets available. [Doc. 185 at 14, ¶¶41-42; Doc. 192 at 9, ¶16]. This resulted in a toilet and sink ratio of 1:15 for inmates housed on A-South in a temporary bunk. [Doc. 187-23].

### i.   Applicable Inspections / Audits of MACC Facilities

Pursuant to a health and safety inspection performed by ODOC on June 25, 2014, ODOC personnel noted MACC's inability to meet "unencumbered space requirements" in housing units A and B due to budget restrictions and the unavoidability of adding unsecured beds in the dayroom areas. [Doc. 187-27 at 9].

### ii.   Alleged Deficiencies with MACC Facilities

Mr. Womble was housed in the A-South unit from May 1, 2014 through February 23, 2016. [Doc. 187-28]. Out of the approximate 664 days Mr. Womble resided in A-South, he was assigned to bunks in A-S common areas for a total of 324 days; was housed in various A-S cells for a total of 336 days; and was held in a segregated housing unit ("SHU") for four days.[6] On May 16, 2014, Mr. Womble submitted a Request to Staff ("RTS") claiming that, pursuant to the recent inmate influx, prisoners in A-South lacked space to store personal items securely and restroom facilities were "deficient." [Doc. 187-14]. Mr. Sharp denied this request on procedural grounds. [*Id*. ("This [RTS] addresses more than one issue.")]. Mr. Womble

---

[6] *See* [Doc. 187-28 at 1 (assigned to A-S common area bunks from May 1 to October 16, 2014); *id*. (assigned to cell SHU 113 from October 16 – 20, 2014); *id*. (assigned to A-S common area bunks from October 20 to December 15, 2014); *id*. (assigned to cell A-S 227 from December 15, 2014 to June 23, 2015); *id*. (assigned to A-S common area bunks from June 23 to September 18, 2015); *id*. (assigned to cell A-S 133 from September 18, 2015 to February 11, 2016); *id*. (assigned to A-S common area bunks from February 11 to February 23, 2016)].

re-submitted his RTS on June 4 "to correct procedural issues" with his prior RTS, stating: "The pods are overcrowded . . . in violation of the fire code." [Doc. 192-5 at 17]. Mr. Sharp responded the following week, stating "the addition of beds were [sic] approved by the fire marshal prior to being placed on the unit" and requesting that Mr. Womble further explain the purported code violation so the issue could be addressed. [*Id*.].

On July 3, 2014, Mr. Womble submitted a Grievance, claiming to have unsuccessfully "attempted several times to file [RTSs]" regarding issues with inmate overcrowding. [Doc. 187-15 at 1]. Mr. Chrisman returned this Grievance unanswered pursuant to procedural deficiencies. [*Id*. at 2 ("No [RTS] attached, showing that you gave the appropriate staff an opportunity to resolve your complaint.")]. Mr. Womble re-submitted his Grievance on July 8 [Doc. 192-5 at 23] and attached an RTS he submitted that same day. [*Id*. at 26]. Mr. Chrisman returned the revised Grievance unanswered, as Mr. Womble had again failed to comply with procedural requirements. [*Id*. at 24]. As for the RTS, Mr. Sharp responded by stating: "You still have not told me what [] violations have occurred or what you want me to do. Be specific and I will address your issue." [*Id*. at 26]. The record contains no indication that Mr. Womble provided Mr. Sharp with the requested information.

Nevertheless, Mr. Womble submitted another Grievance on August 8, 2014, stating that his rights "to nutritious food, airflow, and a health[y] [] environment" were "encroached upon by the stackin[g] of inmates in dayrooms, libraries, and TV rooms" [*Id*. at 29], and again claiming to have submitted "several" RTSs that

"remain[ed] unaddressed." [*Id*. at 28].[7] Mr. Womble submitted a Grievance Appeal Form on August 25, requesting that ODOC order Mr. Chrisman to respond to the August 8 Grievance. [*Id*. at 31-32]. ODOC denied this appeal on procedural grounds. [*Id*. at 33].

Mr. Womble also testified that he made verbal complaints to MACC personnel regarding the need for maintenance in the A-South unit. He testified that he spoke with both Mr. Chrisman and Mr. Sharp on multiple occasions regarding the need for facility maintenance [Doc. 193-5 at 19 (121:6-7), 20 (146:7-21)], but both Defendants refused to fix the problems identified. [Doc. 192-5 at 11, ¶49]. Neither Defendant recalls having any such conversations with Mr. Womble. [Doc. 187-20 at 44 (172:20-173:22), 75 (296:10-16); Doc. 187-24 at 69 (271:15-20)]. Additionally, Mr. Womble testified that, although he spoke with A-S guards regarding maintenance problems for purposes of procuring work orders [Doc. 187-3 at 37 (146:7-15)], "these problems" were "either not fixed or maintenance was delayed" and "when maintenance repaired the reported issues, the toilets and showers often quickly failed again." [Doc. 192-5 at 10, ¶46]. The record contains dozens of resolved maintenance requests submitted by A-S guards from July to December 2014, which show that maintenance issues were typically resolved within hours of being reported, and on one occasion, within eleven days. *See generally* [Doc. 187-18]. Notably, it is undisputed that the communal restrooms in A-South were cleaned once per day. [Doc. 192-3 at 37 (143:24-144:4)].

---

[7] Apart from those submitted on May 16, June 3, and July 8 of 2014, the record contains no additional RTSs from Mr. Womble regarding deficiencies with MACC facilities. And in his July 8 Grievance, Mr. Womble noted that he had submitted only two RTSs regarding the applicable issue – on May 16 and July 8, 2014. [Doc. 192-5 at 23].

### 2.   MACC Food Services

At all times material, food services at MACC were governed by ODOC policy. *See* [Doc. 192-17]. MACC was required to follow the "master menus" generated by ODOC, *see* [Doc. 187-21], of which were created annually by licensed dieticians and designed to meet or exceed recommended dietary allowances – including portion size, nutritional intake, and caloric requirements. [Doc. 192-17 at 3, ¶I(A)(1)]. MACC was further required to serve inmates three meals within each 24-hour period, including two hot meals. [*Id*. at 4, ¶I(A)(1)(a)]. Food service managers were obligated to keep accurate records of all food service requirements and meals. [*Id*. at 10, ¶VIII(A); Doc. 187-19]. Meal variations were permitted on the condition that basic nutritional requirements were met. [*Id*. ¶I(A)(1)(d)]. In the event menu substitutions were implemented, MACC was required to serve food of equal nutritional value to food served in accordance with the master menu. [*Id*. at 6, ¶II(A)(4)]. MACC provided alternative diets to qualified inmates, including but not limited to the Diet for Health and a Kosher diet. [*Id*. at 4-5, ¶I(B)(1)(a), ¶I(C)(1)(a); Doc. 187-22].

### i.   *Applicable Inspections / Audits of MACC Food Services*

Pursuant to the inspection performed in June 2014, ODOC personnel noted the following deficiencies with MACC Food Services: "an excessive amount of flies in the food service area" [Doc. 187-27 at 26]; and a failure by Oklahoma's Health Department to complete a quarterly inspection. [*Id*. at 9]. According to ODOC's audit report, sufficient corrective action was taken to reduce the number of flies in the MACC kitchen. [*Id*. at 9, 26]. On October 28, 2014, ODOC completed another health

and safety inspection of MACC's Food Service Department and noted the following deficiencies: the dish machine was not operating within range to adequately sanitize dishes [Doc. 187-30 at 9]; the ice machine cover was missing [*Id.*]; the inmate restroom near the MACC kitchen contained exposed wiring due to a damaged light fixture [*Id.*]; and the area behind the oven, vent hood, and step pots was dirty with food debris – rendering the space unsanitary [*Id.* at 10]. According to the ODOC audit report, MACC personnel took sufficient action in response to these identified deficiencies. [*Id.* at 9-10].

### ii.   *Alleged Deficiencies with MACC Food Services*

Prior to his incarceration at MACC, in 2011, Mr. Womble's gall bladder was removed pursuant to continued complaints of nausea, gastritis, heartburn, and other intestinal issues related to alcohol consumption. [Doc. 185 at 9, ¶¶2-3; Doc. 192 at 15, ¶1-4]. It is undisputed that Mr. Womble attributes these same symptoms to the quality and quantity of the food served at MACC following the inmate influx. [*Id.* at 9, ¶3; Doc. 192 at 15, ¶1-4]. On October 21, 2013 – prior to the inmate influx – Mr. Womble either requested or was prescribed the Diet for Health due to "gastritis and heartburn" and because he "was overweight." [Doc. 187-3 at 10 (38:14-21); Doc. 187-12 at 2].[8] On January 14, 2014, correctional officers discovered a clear trash bag containing homemade beer hidden in Mr. Womble's laundry bag. [Doc. 187-4 at 8].

---

[8] MACC medical records indicate that Mr. Womble's weight fluctuated throughout his incarceration. *See e.g.,* [Doc. 187-2 at 9 (210 lbs on June 12, 2014), at 12 (198 lbs on June 27, 2014), at 16 (206 lbs on August 15, 2014), at 18 (200 lbs on August 25, 2014), at 27 (195 lbs on January 22, 2015), at 28 (198 lbs on January 29, 2015), at 34 (191 lbs on April 9, 2015), at 46 (192 lbs on July 13, 2015), at 49 (198 lbs on August 13, 2015)].

Notably, Mr. Womble testified his gastritis symptoms "cleared up in 2011 after [he] quit drinking" alcohol and that he historically experienced heartburn after eating "processed food" from gas stations. [Doc. 193-5 at 14 (91:5-15)].

On May 1, 2014 – the day of the inmate influx – Mr. Womble purchased numerous processed food items from the canteen, including a bag of corn chips, five Lil Debbie pastries, a cookie, two ramen noodle packages, candy, Hawaiian punch, and two pints of ice cream. [Doc. 187-9 at 2]. On May 14, he submitted an RTS claiming inmate meals "fell below ACA nutritional standards" and requested an increase in the food budget. [Doc. 187-14]. Mr. Sharp denied this RTS on procedural grounds. [*Id*. ("This [RTS] addresses more than one issue.")]. On May 18, he submitted a Request for Health Services ("RHS") complaining of "bad stomach pain and vomiting."[9] Mr. Womble submitted a Grievance on July 7, stating MACC was "not providing enough food to each inmate because of the overcrowding." [Doc. 187-15 at 1]. Mr. Chrisman returned this Grievance unanswered pursuant to procedural deficiencies. [*Id*. at 2 ("No [RTS] attached, showing that you gave the appropriate staff an opportunity to resolve your complaint.")]. The following month, Mr. Womble told MACC medical staff that he voluntarily skipped meals two to three times per week. [Doc. 192-11 at 20].

---

[9] The record indicates that, from May 5, 2014 to November 19, 2015, Mr. Womble submitted a total of 31 RHSs to the MACC medical unit. *See* [Doc. 192-11]. He sought treatment for digestion-related issues in seven of these 31 requests. [*Id*. at 7 (complaints of "bad stomach pain and vomiting" on May 18, 2014), 12 (requested appointment to review blood work on June 16, 2014), 15 (request for heartburn medication on August 8, 2014), 18-19 (request for heartburn medication on August 15, 2014), 26 (requested Tums, fiber pills, and ducolax on October 16, 2014), 33 (complaints of "bad stomach pain" on March 15, 2015), 35 (requested to switch from Tums to Pepto Bismol on March 31, 2015)].

On September 12, 2014, Mr. Womble requested and was approved for the Kosher diet. [Doc. 187-3 at 6 (23:5-24:20); Doc. 187-12 at 1]. He testified his newfound adherence to Messianic Judaism was partly based upon a belief that eating Kosher would be "a little bit healthier," as it removed "spoiled meat"[10] from his diet. [Doc. 187-3 at 6 (23:13-24:20)]. He returned to the Diet for Health on October 15 because "the Kosher meals weren't serving enough food." [*Id.* at 28 (112:5-14); Doc. 187-12 at 1]. Because Kosher meals came prepackaged from an outside vendor, *see* [Doc. 187-22], Mr. Womble testified there was nothing he could do to obtain a greater quantity of food other than return to the Diet for Health. [Doc. 187-3 at 28 (112:10-12)].

### C.  PROCEDURAL HISTORY

Mr. Womble initiated this action by filing a pro se complaint [Doc. 1] on September 8, 2014 against Mr. Chrisman, Mr. Sharp, Ms. Vitoski, the governor of Oklahoma, and two high-level ODOC officials. The latter three defendants were subsequently dismissed from this case pursuant to FRCP 12(b)(6). *See* [Doc. 40]. Mr. Womble amended his complaint [Doc. 50] on November 19, 2015 while the dismissal was on appeal,[11] naming Mr. Chrisman, Mr. Sharp, and Ms. Vitoski as defendants. By reason of settlement, Mr. Womble voluntarily dismissed Ms. Vitoski from this action in February 2016. *See* [Doc. 66]. In October 2016, Defendants Chrisman and Sharp successfully moved to dismiss the amended complaint by way of FRCP 12(b)(6). *See* [Doc. 78]. Mr. Womble filed a second pro se appeal and was subsequently

---

[10] Mr. Womble has defined "spoiled meat" as "stuff that's rotted [sic] on the ground for vultures to eat" and "dead animals that have been killed outside and just lying on the ground [sic]." [Doc. 187-3 at 6 (23:21-24:2)].

[11] The Tenth Circuit dismissed this appeal for lack of prosecution. *See* [Doc. 59].

appointed pro bono counsel. *See* [Doc. 86]. The Tenth Circuit determined in May 2019 that, in the amended complaint, Mr. Womble plausibly alleged his remaining claims of inadequate nutrition and unsanitary prison facilities. *See* <u>Womble v. Chrisman</u>, 770 F. App'x 918 (10th Cir. 2019).

On remand in September 2019, Defendants filed a summary judgment motion [Doc. 92], arguing that Mr. Womble failed to exhaust his administrative remedies under the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). Summary judgment was granted in favor of Defendants [Doc. 113], and Mr. Womble filed a third appeal. The Tenth Circuit issued a decision in February 2022, holding Mr. Womble was excused from any failure to exhaust under the PLRA. *See* <u>Womble v. Chrisman</u>, No. 21-7015, 2022 WL 334107 (10th Cir. Feb. 4, 2022).

On remand in January 2024, Defendants filed their pending summary judgment motion, arguing that (1) they are entitled to qualified immunity in their individual capacities; (2) there is no evidence to support Mr. Womble's allegation that spoiled or contaminated food was ever served to MACC inmates; (3) food was not rationed in response to the increased inmate population; (4) there was never a time during the applicable period when toilet and shower facilities were completely unavailable; and (5) applicable facility audits and inspections found no sanitation or fixture issues in the A-South unit. *See generally* [Doc. 185]. Mr. Womble timely filed a response opposing summary judgment [Doc. 192],[12] and Defendants timely replied [Doc. 193].

---

[12] On December 29, 2023, Mr. Womble filed his pending motion to compel [Doc. 174] requesting, *inter alia*, that the Court require ODOC to designate additional Rule 30(b)(6) witnesses for further

18

## II.   STANDARDS OF REVIEW

### A.   MOTION FOR SUMMARY JUDGMENT

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the parting asserting a claim. Pursuant to FRCP 56(a), the Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. "Factual disputes that are irrelevant or unnecessary will not be counted." Id. Further, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

However, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, at 249. A court must examine the factual record in light most favorable to the party opposing summary judgment. Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995). Summary judgment is

---

depositions. The Court notes, however, that Mr. Womble subsequently filed his response opposing summary judgment without invoking FRCP 56(f). *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986) (The general principle of Rule 56(f) is that "summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."); *see also* Abdulhaseeb v. Calbone, 600 F.3d 1301, 1310 (10th Cir. 2010) (*citing* Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998) ("[T]he nonmovant must carry its burden in the district court in a timely fashion . . . or explain why it cannot pursuant to Rule 56(f). Otherwise, the nonmovant acts, or fails to act, at its peril.") (additional citations omitted).

appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. (*quoting* FRCP 56(c)).

### B. SUBSTANTIVE REQUIREMENTS FOR CLAIMS UNDER 42 U.S.C. § 1983

A successful § 1983 plaintiff must show: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the violation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

#### 1. Individual Capacity Claims Under § 1983

If prison officials are sued under § 1983 in their individual capacity, as here, the plaintiff must satisfy three specific elements as to each defendant. First, the plaintiff must establish the defendant's "personal involvement or participation" in the alleged violation of a federal right. Grimsely v. MacKay, 93 F.3d 676, 679 (10th Cir. 1996). Second, the plaintiff must establish a causal connection between the acts of that particular defendant and the alleged violation. *See* Pahls v. Thomas, 718 F.3d 1210, 1225-28 (10th Cir. 2013). Finally, the plaintiff must establish that the defendant acted with the state of mind required for the alleged underlying violation. *See* Daniels v. Williams, 474 U.S. 327, 330 (1986).

#### 2. Qualified Immunity from Individual-Capacity Claims

Application of the summary judgment standard slightly differs where, as here, a defendant asserts an affirmative defense to qualified immunity. Qualified immunity protects government officials from liability for harm caused by reasonable

mistakes. Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citation omitted). When qualified immunity is asserted in the context of a motion for summary judgment, evidence beyond the allegations in the complaint is considered and the summary judgment standard detailed above is applied. *See* Ashcroft v. Iqbal, 556 U.S. 662, (2009). The court analyzes a defendant's entitlement to qualified immunity through a two-pronged inquiry in which either prong may be considered first. *See* Pearson, 555 U.S. at 236. To overcome this defense, the plaintiff bears the burden of establishing that the defendant violated his clearly established federal right. *See* Dist. of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018). In this regard, the Court considers: (1) "whether the facts that a plaintiff has … shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson, at 232 (citation omitted).

A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Courtney v. Okla. ex rel. Dep't of Pub. Safety, 722 F.3d 1216, 1222 (10th Cir. 2013). To show that a right is clearly established, the plaintiff "must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Callahan v. Unified Gov't of Wyandotte Cty., ("Wyandotte County"), 806 F.3d 1022, 1027 (10th Cir. 2015) (internal quotation marks and citation omitted). To prevail against a defendant's assertion of qualified immunity, the plaintiff need not identify a case holding the exact conduct in question unlawful. Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir.

2004). The focus is whether the law at the time of the defendant's conduct in provided the defendant with "fair notice" regarding the legality of his conduct. Id.

### 3.   Claims Under § 1983 for Eighth Amendment Violations

As its prohibition against cruel and unusual punishment is interpreted, the Eighth Amendment imposes duties on prison officials "to provide humane conditions of confinement" by "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care" and "tak[ing] all reasonable measures to guarantee the safety of inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citation omitted). Comfortable prisons, however, are not mandated by the Constitution; conditions may be harsh. Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). The standard governing claims asserted under the Eighth Amendment is that of deliberate indifference. To establish deliberate indifference based on unconstitutional conditions of confinement, a § 1983 plaintiff must satisfy both an objective and subjective component.

As to the objective component for a claim of deliberate indifference to inmate health and safety, the conditions the plaintiff complains of must be "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298 (1991), depriving the inmate of "'the minimal civilized measures of life's necessities.'" Id. (quoting Rhodes, at 347). To satisfy the objective prong, the plaintiff "must show that conditions were more than uncomfortable, and instead rose to the level of 'conditions posing a substantial risk of serious harm' to his health or safety." DeSpain v. Uphoff, 264 F.3d 965, 873 (10th Cir. 2001) (quoting Farmer, at 834). Whether there is a substantial risk of serious harm

depends on "the particular facts of each situation; the circumstances, nature, and duration of the challenged conditions must be carefully considered." Id. at 974 (quotation marks and citations omitted). Generally, "the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while substantial deprivations of shelter, food, drinking water, and sanitation may meet the standard despite a shorter duration." Id. at 974 (internal quotations and citation omitted).

As to the subjective component, the plaintiff must establish the defendant acted with a "sufficiently serious culpable state of mind," which in this context means they exhibited "deliberate indifference" to the substantial risk, i.e., that the defendant knew of and disregarded the "excessive risk to inmate health or safety." *See* Farmer, 511 U.S. at 834. A plaintiff must establish such awareness because "prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment" in a manner that violates the Eighth Amendment. Id. at 844; *see* Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006) (holding that *Farmer's* "subjective component is not satisfied[] absent an extraordinary degree of neglect"). Inaction can be sufficient to show the official knowingly created a substantial risk of injury, but the plaintiff must show the official was aware of the risk and "fail[ed] to take reasonable steps to alleviate that risk." Keith v. Koerner, 843 F.3d 833, 848 (10th Cir. 2016).

In determining whether a challenged condition is sufficiently serious, a court considers "the particular facts of each situation." DeSpain, 264 F.3d at 974. When a claim involves numerous alleged inhuman conditions, courts must bear in mind that

23

"[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." Wilson, 501 U.S. at 304. However, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Id. at 305.

## III.  ANALYSIS

For each claim asserted, the Court first considers whether the implicated constitutional right was "clearly established" at the time the respective claim arose and then turns to whether Mr. Womble has rebutted Defendants' contention that no constitutional right was violated.

### A.   COUNT I | INADEQUATE AND/OR UNSANITARY PRISON FACILITIES

Mr. Womble claims Defendants Chrisman and Sharp violated his clearly established right to sanitary prison conditions and specifically alleges that, as a result of the lack of available and/or working restroom facilities following the May 2014 inmate influx at MACC, he was "forced to wade through standing water and feces" in order to take a shower [Doc. 192 at 24]; was "forced" to use communal toilets "in near complete darkness" because lightbulbs had been removed by other inmates housed in the A-South unit [Id.]; was "exposed to mold produced from clogged drains" [Id.]; encountered "exposed wiring in bathrooms" [Id. at 13, ¶34]; experienced "severe emotional damage in the form of embarrassment and anxiety" after soiling himself "on at least five occasions in 2014 and 2015" while waiting for an available toilet [Id.

at 14, ¶39]; suffered "physical pain" and digestive damage from "having to hold bowel movements for long periods" [*Id*. ¶38]; suffered "an inner ear infection" from exposure to "flooding" caused by a clogged shower drain [*Id*. at 15, ¶43]; and sustained a slip-and-fall head injury on a "flood[ed]" cell floor [*Id*.]. According to Mr. Womble, Defendants were aware of these conditions and took no action in response. [*Id*. at 24].

### 1.  Clearly Established Law

As stated, it is Mr. Womble's burden to show that his Eighth Amendment right to sanitary facilities was clearly established at the time he alleges Defendants began violating this right, *i.e.*, in May 2014. *See* Courtney, 722 F.3d at 1222. To make this showing, Mr. Womble "must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as [he] maintains." Wyandotte County, 806 F.3d at 1027; *see* Hope v. Pelzer, 536 U.S. 730, 741 (2002) (noting the contours of a clearly established right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right"). In his response opposing summary judgment, Mr. Womble has identified a total of two Tenth Circuit decisions that establish a constitutional right to reasonably adequate sanitation and utilities such that an inmate's mental and physical wellbeing is not threatened [Doc. 192 at 19-20, 28 (*citing* Ramos v. Lamm, 639 F.2d 559, 568 (10th Cir. 1980))], which includes the right to be free from prolonged exposure to human waste [*Id*. at 24, 28 (*citing* DeSpain, 264 F.3d at 974)].

The Court concludes Mr. Womble has demonstrated the right to reasonably adequate and sanitary prison facilities, specifically his right to be free from prolonged exposure to human waste, was "clearly established" before May 2014. The Court further notes that, although the allegations underlying his unsanitary facilities claim include far more than exposure to human waste, Mr. Womble has not set forth any authorities pertaining to these additional allegations. Consequently, he has not met his burden of showing that the clearly established right to adequate sanitation compels prison officials to ensure that inmates receive unmitigated access to a toilet and/or shower, protection against inmates removing lightbulbs from restroom facilities, or a guarantee to never encounter exposed wiring while incarcerated. *See* Rhodes, 452 U.S. at 347 ("[T]he Constitution does not mandate comfortable prisons," and conditions imposed may be "restrictive and even harsh.").

### 1.   Deliberate Indifference Analysis

Against that backdrop, to prove his Eighth Amendment claim based on failure to provide sanitary facilities, Mr. Womble "must show that conditions were more than uncomfortable, and indeed rose to the level of 'conditions posing a substantial risk of serious harm' to inmate health or safety." DeSpain, 264 F.3d at 973. Many courts, including the Tenth Circuit, have considered various scenarios to determine whether and how the Eighth Amendment is implicated with regard to cleanliness, sanitation, and availability of bathroom and shower facilities in the prison context. *See e.g.*, Shannon v. Graves, 257 F.3d 1164 (10th Cir. 2004) (affirming summary judgment where evidence tended to show that frequent plumbing and sewer problems were

addressed by the facility within a couple of days);[13] <u>Fruit v. Norris</u>, 905 F.2d 1147, 1151 (8th Cir. 1990) (noting "courts have been especially cautious about condoning conditions that include an inmate's proximity to human waste");[14] <u>Whitted v. Lazerson</u>, No. 96 CIV. 2746 (AGS), 1998 WL 259929 at *2 (S.D.N.Y. May 21, 1998) (unpublished) ("The temporary deprivation of the right to use the toilet, in the absence of serious physical harm or serious risk of contamination, does not rise to the level of an Eighth Amendment violation.").[15]

### i. *"Sufficiently Serious" Conditions*

To satisfy the objective prong of the *Farmer* test, Mr. Womble must show the alleged conditions rose to the level of a condition "'posing a substantial risk of serious harm' to inmate health or safety." <u>DeSpain</u>, 264 F.3d at 973 (*quoting* <u>Farmer</u>, 511 U.S. at 834). Whether a "substantial risk" existed depends on "the particular facts of each situation; the circumstances, nature, and duration of the challenged conditions must be carefully considered." <u>Id</u>. at 974. The factual record developed by Mr. Womble provides little, if any, indication as to the frequency and duration of his alleged

---

[13] *See also* <u>Reynolds v. Power</u>, 370 F.3d 1028, 1031 (10th Cir. 2004) (finding no Eighth Amendment violation where a prison shower did not drain properly and left standing water in the shower area); <u>Lamb v. Howe</u>, 677 F. App'x 204 (6th Cir. 2017) (unpublished) (inmate's exposure to several inches of unsanitary toilet water for four hours after several other inmates intentionally clogged their toilets is insufficient to state a claim under the Eighth Amendment).

[14] *See also* <u>DeSpain</u>, at 975-75 (inmate's exposure to human waste for 36 hours was "sufficiently serious" under the Eighth Amendment); <u>McBride v. Deer</u>, 240 F.3d 1287, 1292 (10th Cir. 2001) (finding "sufficiently serious conditions" where inmate was placed in feces-covered cell for three days); <u>Taylor v. Peters</u>, 274 Or. App. 477, 361 P.3d 54 (2015), *aff'd*, 360 Or. 460, 383 P.3d 279 (2016) (finding Eighth Amendment violation where other inmates threw feces into plaintiff's cell, which constituted a serious, immediate, and ongoing health hazard that required immediate judicial attention).

[15] *See also* <u>Ledbetter v. City of Topeka, Kan.</u>, 318 F.3d 1183, 1188 (10th Cir. 2003) (inmate placed bare footed in cell without a toilet for five hours is not a "sufficiently serious" deprivation under the Eighth Amendment); *but see* <u>Willey v. Kirkpatrick</u>, 801 F.3d 51 (2d Cir. 2015) (finding Eighth Amendment violation where toilet was intentionally shut off, exposing inmate to human waste for seven days).

deprivations. *See* id. ("[T]he length of exposure to the conditions is often of prime importance."). He alleges maintenance issues were "frequent" [Doc. 192 at 24], communal bathrooms were "often" out-of-service [*Id*.], he was "often" exposed to standing water and feces [*Id*.], and he soiled himself either "several times" [*Id*.] or "on at least five occasions in 2014 and 2015" while waiting for a communal toilet. [*Id*. at 14, ¶39]. The evidence put forth by Defendants provides some temporal clarity in showing Mr. Womble was assigned to cells for approximately 336 of the 664 days[16] he was housed in the A-South unit. It is undisputed that each A-S cell contained a personal toilet and sink; therefore, Mr. Womble presumably had unlimited access to a toilet and running water (without having to wait in a communal restroom queue) for over half of his A-South residency. Nevertheless, on this record, the duration of the alleged deprivations is not clear enough for the Court to determine whether Mr. Womble has established the challenged conditions were "sufficiently serious."

Turning to the circumstances and nature of the alleged deprivations, Mr. Womble alleges he suffered from digestive damage due to holding bowel movements, severe emotional damage and depression, exposure to feces and urine, a slip-and-fall head injury, and an inner ear infection. To start, federal courts have consistently held that slippery prison floors do not violate the Eighth Amendment.[17] The record also

---

[16] *See* n.4 and n.6 *supra*. Mr. Chrisman was MACC's Warden for approximately 397 of the 664 days that Mr. Womble was housed in A-South, and Mr. Womble was assigned to A-S cells for 172 of those 397 days. Mr. Sharp was MACC's Deputy Warden for approximately 277 of this 664-day period, and Mr. Womble was assigned to A-S cells for 53 of those 277 days.

[17] *See e.g.*, LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993) (noting that "slippery prison floors … do not state even an arguable claim for cruel and unusual punishment") (quotation omitted); Snyder v. Blankenship, 473 F.Supp. 1208, 1212-13 (W.D.Va. 1979), *aff'd*, 618 F.2d 104 (4th Cir. 1980) (noting a prisoner's "slip and fall incident … could just have easily occurred in any other state-owned facility," and that the "incident makes out nothing more than a common law tort").

28

shows no mold was found during applicable ODOC health and safety inspections of MACC facilities. Apart from his own testimony, Mr. Womble has provided no evidence to establish he suffered an inner ear infection from exposure to a clogged shower drain and, assuming this fact were true, it is not suggestive of a "serious deprivation of basic human needs" or "the wanton and unnecessary infliction of pain." Rhodes, 452 U.S. at 347.

Furthermore, while exposure to human waste may by itself satisfy the objective prong (particularly in cases where the specific duration of exposure can be established), Mr. Womble has provided no evidence apart from his own conclusory testimony that could show these alleged conditions occurred. Conversely, it is undisputed that A-S facilities were cleaned on a daily basis and the record demonstrates pertinent maintenance issues were typically resolved within hours of being reported and, on one occasion, within eleven days. *See* Shannon, 257 F.3d 1164 (affirming summary judgment where evidence tended to show that frequent plumbing and sewer problems were addressed by the facility within a couple of days);[18] *see also* Scott, 550 U.S. at 380. When construing the record in light most favorable to Mr. Womble, the Court concludes he has not demonstrated a "sufficiently serious" deprivation of his Eighth Amendment right to sanitary prison facilities.

---

[18] While these facts are not dispositive to whether "sufficiently serious" conditions existed, the Court notes that the alleged exposure to human waste is not a present danger to Mr. Womble's health or safety, and Mr. Womble testified that he "never actually got sick from being exposed to feces." [Doc. 187-3 at 33 (132:4-5)].

### ii.   *Official Knowledge of Conditions*

Even if he could establish the alleged deprivations were sufficiently serious, Mr. Womble cannot demonstrate that Defendants acted with deliberate indifference in exposing him to the alleged conditions and refusing to remedy the same. *See* Farmer, 511 U.S. at 837 (the test for deliberate indifference requires both knowledge and disregard of possible risk). His attempt to prove liability rests on four pieces of evidence. First, Mr. Womble contends Mr. Chrisman's statements that he regularly walked the A-South unit and maintained an awareness of the conditions therein, *see* [Doc. 192-2 at 84 (326:2-16)], demonstrates that both Defendants had knowledge of the inhumane conditions of A-S facilities. *See* [Doc. 192 at 25]. This evidence clearly does not support the suggestion that Mr. Sharp was aware of the alleged conditions. As for Mr. Chrisman, "[a]n official's failure to alleviate a significant risk of [serious harm] of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008). Mr. Womble offers nothing that could demonstrate Mr. Chrisman encountered *and* ignored the alleged conditions while walking the A-South unit.

Second, Mr. Womble alleges Mr. Chrisman knowingly refused to remedy the alleged conditions by choosing not to exercise his ability to request additional funding for A-South facilities. [*Id.* at 25]. In support of this allegation, Mr. Womble cites to the deposition of an ODOC Rule 30(b)(6) witness who stated that she could not recall offhand whether either Defendant requested additional funding for MACC in 2014 or

30

2015. *See* [Doc. 192-15 at 9 (26:8-18)]. This evidence clearly does not support Mr. Womble's conclusory allegation that Mr. Chrisman was deliberately indifferent to the alleged conditions. *See* <u>Pueblo Neighborhood Health Centers, Inc. v. Losavio</u>, 847 F.2d 642, 650 (10th Cir. 1988) ("[P]laintiffs should not be allowed to overcome a properly submitted motion for summary judgment based on qualified immunity grounds without more than conclusory and nonspecific allegations.").

Third, Mr. Womble asserts that he unsuccessfully raised verbal complaints with Defendants regarding exposure to human waste [Doc. 192-5 at 11, ¶49], and the conditions of A-S restrooms. [Doc. 192-3 at 31-32 (120:25-121:8)]. While this fact is disputed, the Court concludes that no reasonable juror could find in Mr. Womble's favor in light of additional conflicting evidence proffered by Defendants. *See* <u>True v. United States</u>, 190 F.3d 1165, 1177 (10th Cir. 1999).

In a similar vein, Mr. Womble finally argues that both Defendants were deliberately indifferent to the risk of harm posed by the alleged conditions because they "rejected" or gave "dismissive answer[s]" in response to his six applicable inmate complaints. *See* [Doc. 192 at 25]. The insinuation that Defendants were required to respond to these complaints lacks sufficient evidentiary support, and "a denial of a grievance, by itself without any connection to the violation of constitutional rights alleged . . . does not establish personal participation under § 1983." <u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1069 (10th Cir. 2009). Moreover, all but one of these six complaints were procedurally deficient. Defendants informed Mr. Womble of this fact on numerous occasions. In his timely response to the only procedurally firm complaint

submitted by Mr. Womble, Mr. Sharp requested further information on how "overcrowding" was "in violation of the fire code." [Doc. 192-5 at 17]. Instead of providing Mr. Sharp with the requested information, Mr. Womble submitted four additional procedurally deficient complaints. Under no obligation to do so, Mr. Sharp again requested further information so that he could address the purported issues, and Mr. Womble again failed to provide Mr. Sharp with details sufficient enough for the alleged issues to be addressed. Under these circumstances, Mr. Womble was the author of his deprivation rather than a victim of Defendants' deliberate indifference.

The Court concludes the allegations of Defendant's "knowledge" are conclusory and devoid of facts from which the inference could be drawn that the alleged issues with MACC facilities posed a substantial risk of serious harm to Mr. Womble or that Defendants actually drew this inference. *See* Farmer, 511 U.S. at 837. As Mr. Womble has failed to satisfy either prong of the *Farmer* test, Defendants are entitled to qualified immunity in their individual capacities on the unsanitary facilities claim. *See* Swanson v. Town Mountain View, Colo., 577 F.3d 1196, 1199 (10th Cir. 2009).

### B.   COUNT II | INADEQUATE NUTRITION

Mr. Womble next claims that Defendants Chrisman and Sharp violated his clearly established constitutional right to adequate nutrition by ordering that food be rationed after the May 2014 inmate influx instead of requesting additional funds from ODOC. [Doc. 192 at 20-24]. He alleges that, from May 2014 to August 2016, MACC Food Services served him reduced portion sizes, spoiled food, food contaminated with roaches, insects, and hair. [*Id*. at 20], and food "too heavily processed for [his] stomach

to handle" [*Id*. at 10, ¶24]. As a result of Defendants' deliberate indifference to these alleged deprivations, Mr. Womble claims he suffered from "sustained food deprivation" [*Id*. at 21], a "turbulent cycle of weight loss" [*Id*.], vomiting and/or an inability to eat [*Id*. at 10, ¶24].

### 1.   Clearly Established Law

In their summary judgment motion, Defendants concede that an inmate has a constitutional right to "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it." Ramos, 639 F.2d at 570-71. They argue, however, that there is no clearly established law providing the Eighth Amendment is violated when food is "occasionally" unpalatable or contaminated, or subjectively insufficient to satiate a particular inmate. [Doc. 185 at 29]. In response, Mr. Womble contends his inadequate nutrition claim is based on "regularly being served 'inadequate amounts' of 'spoiled food' between May 2014 and September 2015, causing him to become ill and lose 21 pounds." [Doc. 192 at 26, 27 n.5 (listing cases from other circuit courts establishing an Eighth Amendment right to adequate nutrition)]. The Court concludes Mr. Womble has sufficiently shown his right to adequate nutrition was "clearly established" prior to May 2014.

### 2.   Deliberate Indifference Analysis

Indeed, prison officials must provide "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it." Ramos, at 570-71. "A

substantial deprivation of food may be sufficiently serious to state a conditions-of-
confinement claim under the Eighth Amendment." Trujillo v. Williams, 465 F.3d
1210, 1227 (10th Cir. 2006) (*quoting* Thompson v. Gibson, 289 F.3d 1218, 1222 (10th
Cir. 2002)).[19] While no published Tenth Circuit cases address with specificity what
constitutes a "substantial" deprivation of food, other circuits have provided a rubric.
*See* Reed v. McBride, 178 F.3d 849, 853 (7th Cir. 1999) (noting courts look at the
amount and duration of a deprivation).[20]

### i.   *"Sufficiently Serious" Conditions*

Mr. Womble alleges that, as a result of being served "inadequate portions" and
"spoiled foods" [Doc. 192 at 10, ¶24], he suffered from stomach pain, vomiting, and
lost approximately twenty pounds. [*Id*. at 20-21]. The frequency and duration of these
alleged deprivations is unclear and ostensibly inconsistent. *See* [*Id*. at 20 (alleging
"inadequate meal service" at MACC from "2014 to 2016"), 22 (alleging "prolonged
periods of food rationing" from "May 2014 to August 2016"), 26 (alleging service of
"inadequate [portions]" and "spoiled food" "between May 2014 and September 2015");
Doc. 192-4 at 5 (stating "nutritionally inadequate meals started in late May or early

---

[19] *See e.g.,* Berry v. Brady, 192 F.3d 504, 508 (5th Cir. 1999) (to state an Eighth Amendment claim,
inmate must allege "he lost weight or suffered other adverse physical effects or was denied a
nutritionally and calorically adequate diet"); Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th Cir. 1996)
(prisoner stated Eighth Amendment violation by claiming "not just 'ransid food' [sic], but also a
'nutritionally deficient' diet"); Rust v. Grammar, 858 F.2d 411, 414 (8th Cir. 1988) (diet without fruits
and vegetables might violate Eighth Amendment if it were the regular prison diet).

[20] *See e.g.,* Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (denial of one meal on three different
days was too minor to succeed on an Eighth Amendment claim); Freeman v. Berge, 441 F.3d 543, 545
(7th Cir. 2006) (providing one meal a day for two weeks did not rise to level of cruel and unusual
punishment despite inmate's 45-pound weight loss); *but see* Atkins v. City of Chicago, 631 F.3d 823,
830 (9th Cir. 2011) ("Depriving a person of food for four days would impose a constitutionally
significant hardship").

June 2014")]. Thus, the record is not sufficiently clear for the Court to determine whether the duration of these alleged deprivations constituted a sufficiently serious risk to Mr. Womble's health or safety.

Turning to the circumstances and nature of the alleged deprivations, Mr. Womble alleges food rationing placed him in a "starvation state" that led to hunger and weight loss. *See* [Doc. 192 at 23]. While the record confirms he lost about twenty pounds in the year following the May 2014 influx, the record also shows that: (i) Mr. Womble classified as clinically obese in June 2014, weighing 210 pounds at 5' 9" in height [Doc. 187-2 at 6]; (ii) after losing six pounds within a span of nine days in late-August 2014, Mr. Womble admitted he had been voluntarily skipping meals two to three times per week; (iii) on October 1, 2014, he chose to consume the Diet for Health with knowledge that this meal plan was designed for weight loss [Doc. 187-3 at 10 (38:14-21)]; (iv) he lost seventeen pounds after returning to the Diet for Health in October 2014 [Doc. 192-18 at 8]; and (v) he testified that he "wasn't starving" during the applicable period, he "just didn't feel full." [Doc. 192-3 at 45 (176:5-20)]. Indeed, the record suggests that Mr. Womble voluntarily made decisions which naturally resulted in weight loss.[21]

Next, Mr. Womble alleges he "was regularly served food that had been contaminated with roaches, insects, and hair." [Doc. 192 at 20 (*citing* Doc. 192-3 at 21 (77:1-11)]. While ODOC's investigation in June 2014 revealed "an excessive amount of flies" in the MACC kitchen, this evidence does not establish that Mr.

---

[21] *See* n.4 and n.8 *supra*.

Womble was "regularly" served food containing human hair and various insects. Apart from his own testimony and one RTS that he submitted outside the applicable period, *see* [Doc. 187-32 (complaining of roach found in food in January 2014)], Mr. Womble has provided no evidence to support the conclusory allegation that he was personally served contaminated meals on a regular basis. The same is true is for Mr. Womble's allegation that MACC Food Services served him nutritionally unsound meals because the food was "spoiled" and/or "heavily processed." [Doc. 192 at 10, ¶24; Doc. 192-3 at 9 (30:17-31:8), 19 (71:20-72:2)].

The summary judgment record, taken in the light most favorable to Mr. Womble, indicates that he voluntarily made decisions which reasonably resulted in the harm that he imputes to Defendants. Mr. Womble fails to specify how Defendants could be held liable for his non-compulsory decision to periodically skip meals and/or consume alternative diets offered by MACC Food Services. The Court therefore concludes that Mr. Womble has not demonstrated a "sufficiently serious" deprivation of his Eighth Amendment right to adequate nutrition.

### ii.   *Official Knowledge of Conditions*

Even if he could satisfy the objective component of the *Farmer* test, Mr. Womble cannot show that both Defendants "knew [he] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." Callahan v. Poppell, 471 F.3d 1155, 1159 (10th Cir. 2006) (quotation omitted). Mr. Womble has set forth an array of allegations in attempts to meet his burden of establishing (1) the "personal involvement or participation" of each Defendant in the

alleged violation, <u>Grimsely</u>, 93 F.3d at 679; (2) a "causal connection between the acts" of each Defendant "and the alleged violation," <u>Pahls</u>, 718 F.3d at 1225-28; and (3) that each Defendant "acted with the state of mind required for the alleged underlying violation." <u>Daniels</u>, 474 U.S. at 330.

Mr. Womble initially alleges that he unsuccessfully "pleaded" with Defendants "for months" to address the insufficient quantity and quality of food. [Doc. 192 at 21]. The record does not support this conclusory allegation. Mr. Womble submitted a total of two complaints regarding MACC Food Services during the applicable period, both of which were returned unanswered by Defendants Chrisman and Sharp due to procedural deficiencies. By failing (or refusing) to comply with ODOC policy *after* being informed his previous complaints were procedurally infirm, Mr. Womble exhibited an indifference to the rules governing Defendants' authority to substantively address to his grievances. And by failing (or refusing) to provide Mr. Sharp with the requested information regarding the alleged conditions, Mr. Womble exhibited an indifference to Defendants' ability to resolve his complaints.

He also claims to have verbally raised complaints regarding inmate meals with both Defendants; however, even construing the record in a light most favorable to Mr. Womble, this Court finds that Mr. Womble has failed to show personal involvement, an affirmative link, or a sufficient causal connection between the alleged constitutional violation and either of the Defendants. Thus, the Court is not convinced a trier of fact could reasonably conclude Defendants were "deliberately indifferent" to a substantial risk of serious harm to Mr. Womble on the bases alleged. Defendants

Chrisman and Sharp are therefore entitled to qualified immunity in their individual capacities on the inadequate nutrition claim.

## IV.   CONCLUSION

WHEREFORE, the motion for summary judgment [Doc. 185] of Defendants Jerry Chrisman and Tommy Sharp is hereby **GRANTED**.

IT IS SO ORDERED this 11th day of June, 2024.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE